

# NUMBER 13-20-00032-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

PATRICK HUGH WAYMAN,                                           Appellant,

v.

THE STATE OF TEXAS,                                               Appellee.

## On appeal from the 413th District Court of Johnson County, Texas.

# MEMORANDUM OPINION

**Before Justices Benavides, Hinojosa, and Silva**
**Memorandum Opinion by Justice Silva**

Appellant Patrick Hugh Wayman appeals his murder conviction.[1] *See* TEX. PENAL CODE ANN. § 19.02. By six issues, Wayman argues (1) the trial court abused its discretion in allowing "the State to violate multiple agreed orders related to disclosure of expert data"; (2) the State violated his rights by failing to produce the medical examiner's full report; (3) the trial court abused its discretion in allowing multiple lay witnesses to give expert testimony; (4) the trial court abused its discretion in prohibiting Wayman from presenting evidence regarding the complainant's criminal history; (5) the trial court erred in denying Wayman's jury charge instruction on a defensive theory; and (6) the trial court abused its discretion in denying Wayman's motion for continuance. We affirm.

## I.    BACKGROUND

On October 7, 2017, Wayman was arrested for murder for shooting his longtime friend, Brett Bethurum, following an altercation in Wayman's home.

## A.    Motion for Continuance

Three weeks before trial, Wayman filed a motion for continuance on October 16, 2019.[2] Wayman requested that the "case be continued until a later date," citing "continuing and serious health conditions, including but not limited to End-Stage Chronic Obstructive Pulmonary Disease [(COPD)], asthma, Neuropathy, and a spinal injury." At a hearing on Wayman's motion, Kathryn Dykes, a Registered Nurse and the Health

---

[1] This case is before this Court on transfer from the Tenth Court of Appeals in Waco pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

[2] The trial had been reset twice before, and following the State's motion for continuance in October 2018 because the medical examiner was unavailable, Wayman filed a "motion for speedy trial," requesting that "the trial be held on November 6, 2018," as originally set. *See* U.S. CONST. amend. VI, XIV; *Balderas v. State*, 517 S.W.3d 756, 767 (Tex. Crim. App. 2016) ("The Sixth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, guarantees a speedy trial to an accused.") (internal citations omitted). The trial was reset two more times until October 2019, when Wayman filed his first and only motion for continuance.

Services Administrator at Johnson County Law Enforcement Center, testified regarding Wayman's health issues.

According to Dykes, Wayman was incarcerated awaiting trial from 2017 until November 2018. In February 2018, Wayman was hospitalized for two weeks following acute exacerbation of his "end stage" COPD condition. Wayman required a ventilator during his hospitalization. Dykes explained that COPD "progressively gets worse over time," and Wayman is in a "maintenance phase due to the fact there is no cure." Dykes testified that Wayman also has a history of compression fractures from his thoracic spine, seizure disorder, and cachexia. Wayman was on "multiple medications" to address his various ailments, and more specifically, he required the use of a palm-sized inhaler. When asked if Wayman could maintain his "proper course of [medical] therapy" if he were "able to get his medication when he needed it throughout the course of trial," Dykes answered in the affirmative.

Wayman testified that, in February 2018, his physicians had given him a life expectancy of "one to three years." Wayman, who was also wheelchair-bound, said he would not "be able to breathe" and would be "in pain" if he had to sit through a trial. Wayman testified that he required an oxygen tank, and his tank only lasted "[a] few hours, two or three, four at the most." Wayman requested a hospital bed accommodation. On cross-examination, Wayman agreed that he could bring his oxygen tank to court and refill it if the trial court provided periodic recesses for him to do so. He could likewise self-administer his medication at the courthouse.

The trial court denied Wayman's request for continuance. The case went to trial on November 7, 2019.

**B. Trial**

At trial, Wayman admitted to shooting Bethurum inside his residence on October 7, 2017, but Wayman claimed he acted in self-defense and in defense of his property. The State argued that Wayman's proposed justifications were unsupported by forensic evidence.

**1. Wayman's and Bethurum's Appearance**

Chris Rodriguez, a Venus Police Department (VPD) Officer, testified he was dispatched to Wayman's residence shortly after 6 a.m. on October 7, 2017, following reports of a shooting.[3] Rodriguez was one of the first officers to arrive and noted that Wayman had two small "blood spots," one on his jacket[4] and one on his leg, but his hands were clean. Rodriguez testified he observed no signs indicating Wayman had been assaulted or that a physical altercation had transpired in the home apart from where Bethurum's body laid.

Bethurum's body was found lying face-down in the hallway of Wayman's residence, and Rodriguez recalled that he did not see any signs of life. The State thereafter asked Rodriguez to elaborate on his "understanding of what lividity is." Defense counsel objected, arguing that the State was improperly seeking an expert opinion from a lay witness. The State contended it was asking Rodriguez to make a statement based

---

[3] Wayman's 9-1-1 call recording was admitted into evidence, wherein he can be heard stating, "I shot my buddy a couple of times because he was going crazy on me . . . Shot [him] twice . . . once in the shoulder and once in the leg. . . . I gave him a chance . . . and he decided he wanted to play. I think [he] was trying to do suicide by friend."

[4] Erin Casmus, a forensic scientist with the Texas Department of Public Safety Crime Laboratory, testified that the DNA obtained from Wayman's sweatshirt was "440 septillion more times likely" to have come from Bethurum than an unrelated, unknown individual.

on his "training and experience." The trial court overruled defense counsel's objection, and the following colloquy ensued:

[State:] . . . We heard you use the phrase "lividity." What does lividity, in terms of homicide investigation, what does that mean?

[Rodriguez:] My understanding is a discoloration, paleness, purpleness color of the skin due to lack of blood flow.

[State:] Did you notice that on this individual, on Brett Bethurum's body?

[Rodriguez:] Yes, sir.

[State:] Can you tell us where you noticed that?

[Rodriguez:] I noticed on his hand, on his face, some on his arms.

Chase Blume, a former emergency medical technician, testified Bethurum was declared dead at 6:49 a.m., after his partner made the determination that Bethurum displayed "signs incompatible with life." Blume explained, "The lividity was setting in. He was pretty purple when we rolled him over, which is blood pooling up, the heart is not pumping the blood anymore. And then when we rolled him, he was starting to get stiff." Blume thereafter testified that rigor mortis typically occurs "[o]ver the course of time" and did not provide further specifics.

Johnson County Deputy Sheriff Kenneth Bartlett, who was also one of the first individuals to arrive at the residence, testified that it "appeared that there had been some time" between when Bethurum passed and when he viewed the body. Bartlett described Bethurum as "extremely pale," with "purple spottings [sic] along his arm."[5] Bartlett also

---

[5] Following Bartlett's testimony, Wayman reargued his objection regarding lay witness testimony concerning lividity and time of death, additionally alleging that the State had failed to timely disclose time of death evidence in violation of *Brady* and an existing motion in limine. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). The trial court overruled Wayman's objections.

testified that although he would "expect to see broken items, furniture knocked over, [and] things knocked off into the floor" based on Wayman's claims of a physical altercation leading up to the shooting, the home did not appear to be in disarray.

Texas Ranger Don Stoner arrived at the residence at approximately 11:28 a.m. Stoner testified that "based on the amount of blood" present on the carpet under Bethurum's body, he would have expected to see blood on any individual claiming to have been pinned under Bethurum. Stoner opined he also did not see any indicators of a struggle in the home.

### 2. Wayman's Interview

James Groom, VPD police chief, testified Wayman was transported to the police station "sometime before 7 a.m." Wayman's recorded interview with police was admitted into evidence, wherein he stated he had met Bethurum in the late 1980s, and although there was a period of time that they did not see one another, they renewed their friendship following the dissolution of their respective marriages. Wayman stated Bethurum would often do yard work for him, and on October 6, 2017, Bethurum arrived at Wayman's residence around 3 p.m. or 4 p.m. to mow the lawn. Bethurum thereafter joined Wayman for dinner. The two men spent the early evening hours on the front patio, eating, drinking, and socializing, before moving the conversation indoors.

Wayman drank several beers throughout the evening, and sometime between 1 a.m. and 2 a.m., he took his medication for insomnia. At some unspecified point, the conversation centered around the breakup of Bethurum's band, a topic which upset Bethurum. Although "there was no yelling," Wayman said Bethurum was "hostile and drunk." Wayman was unable to "remember exactly what was said" but told police: "I think

6

at one point I even told [Bethurum] to leave, but I didn't want him to leave because I didn't want him to drive." Wayman said, "I raised my voice and told [Bethurum] to go get on the couch." Once Bethurum refused, Wayman said what transpired next occurred quickly: "Out come[s] the gun. 'Go get on the couch.' Boom. He's on me. And that's when I shot him in the leg." Wayman later clarified he had retrieved the gun from a kitchen drawer, which prompted Bethurum to rush towards him and eventually pin him to the floor. Wayman said he was on his back on the floor, with Bethurum hovering over him, when he first shot Bethurum in the leg. Wayman shot Bethurum again several seconds later. Bethurum then stopped moving, and Wayman, who was still on the floor under Bethurum, pushed Bethurum off his body and called 9-1-1.

Groom testified that Wayman had difficulty articulating what prompted him to retrieve the weapon. Groom stated, "[Wayman] specifically said that [Bethurum] never threw any strikes[,] and he never made any claims about [Bethurum] going for a weapon or presenting a weapon." Groom testified that Wayman further claimed he maintained control of the firearm the entire time throughout the "30 second[]" incident. After Wayman shot Bethurum, Wayman did not attempt to provide Bethurum with medical treatment and denied seeing "a lot of blood leaking out." Groom testified that Wayman had a "couple of smaller abrasions" around his ankle and lower leg, but Wayman otherwise had no bruising or abrasions anywhere else on his body.[6] The only blood present on Wayman was on his sleeve.

---

[6] We observe that in the photographs admitted at trial taken of Wayman prior to his arrest, Wayman appears to have a red mark on the back of his head.

7

Wayman was subsequently placed under arrest for murder because Wayman's "statements were not consistent" with the injuries he presented, and by Wayman's own account, the physical altercation only occurred after Wayman pulled out the weapon despite the absence of threatening action from Bethurum. Groom elaborated, "During a course of a heated discussion, there's—[Wayman] never claims that the victim ever made any threats to him or subjected him to physical abuse or did anything other than maybe standing up during this heated discussion." On cross-examination, Groom conceded he was aware of Bethurum's criminal history, which included a domestic violence-related conviction.

### 3.    Bethurum's Autopsy

Dr. Nizam Peerwani, the county medical examiner, performed the autopsy on Bethurum on October 8, 2017. Peerwani testified Bethurum sustained two gunshot wounds: one to the left shoulder and the other to the right thigh. Bethurum's cause of death was a "gunshot wound" to his left shoulder causing an "eventual cardiogenic shock and death."[7]

Peerwani stated he was able to roughly deduce the weapon's discharge range based on the location of the entry and exit wounds. Peerwani opined that the fatal shot to Bethurum's left shoulder occurred with "loose contact" at a "very close range." Peerwani observed "blackening" and "soot" but did not see "any muzzle imprint around the defect." The shape of the entry wound "impl[ied] the bullet hit the body not perpendicular or a

---

[7] Peerwani further testified that Bethurum was 5-foot-10-and-a-half inches tall, weighed 211.2 pounds, and had a "cirrhotic liver." The postmortem toxicology report revealed Bethurum's blood alcohol concentration level was .339, a measurement of alcohol intoxication indicating Bethurum's impairment exceeded four times the legal limit for operating a motor vehicle. Peerwani maintained Bethurum's excessive alcohol consumption was not his cause of death.

straight shot but at a tangent." Peerwani testified that the bullet "traveled some 9 inches downward," missing the heart and major blood vessels but lacerating Bethurum's lung and exiting his "mid-back." Regarding the nonfatal shot to Bethurum's thigh, Peerwani was unable to estimate the distance between the entry wound and discharged weapon, opining only that it was likely thirty inches or more.[8] Peerwani further testified that the location of thigh wound was "inconsistent" with Wayman's assertion that he was under Bethurum's body when he shot him.

When asked by the State whether he had "an opinion as to how long" it would have taken from the initial wound "to the point at which the heart becomes ineffective and the person died," Peerwani responded that he was unable to provide a time of death prediction given the presence of multiple unknown variables, including how rapidly air entered Bethurum's chest cavity and how rapidly Bethurum bled. "But suffice to say the earliest would be no less than 5, 10 minutes or maybe little bit more [from the time of the fatal shot], . . . . And I can't give you anymore [sic] precise time than that, sir," testified Peerwani. Peerwani additionally stated that although the autopsy report listed Bethurum's time of death at 6:49 a.m. on October 7, 2017, the listed time of death is "the time that [Bethurum] was legally pronounced dead at the scene where he was found." Peerwani clarified that the time stamp is not the exact moment that Bethurum died.

Peerwani then discussed rigor mortis, explaining that it is the "stiffening of the body after a person has passed away" and "takes eight to 12 hours" to reach completion.

---

[8] Stacey Phetteplace, firearm and toolmark analyst with the Texas Department of Public Safety, testified regarding her professional opinion of the distance between the weapon discharged and impact site. Phetteplace testified that the shot to Bethurum's left shoulder was a "contact shot," but she observed no gunshot residue for the shot to Bethurum's leg. "[U]sing the firearm with the laboratory ammunition and the evidence ammunition, particles of gunshot residue were observed out to 36 inches," testified Phetteplace, further explaining that the weapon was likely discharged more than thirty-six inches away.

Consequently, Peerwani testified, it would have been "[v]ery unlikely" for rigor mortis to present itself in forty or forty-five minutes after the fatal shot. The State thereafter hypothesized whether lividity would be fixed at 8:30 a.m. "if [Bethurum] had died at, say, 6 a.m. that morning." Peerwani responded, "No, sir, it would not be fixed at this time," and maintained he was unable to provide a more precise window.

Regarding lividity, Peerwani explained that it was the pooling of blood after death, which results in the pale or "blanching" appearance of skin. Peerwani testified that lividity can take "six, eight, [ten] hours to get fixed." Like rigor mortis, how soon lividity becomes "fixed" is contingent on multiple factors, but "one-and a half or two hours is too early for it to be fixed."

### 4.   Bethurum's Propensity for Violence

Terry Foster testified he had known Bethurum for almost twenty years, and the two played together in a rock cover band, Not Exactly Dylan. The group disbanded a few months prior to Bethurum's death due to Bethurum's excessive drinking. According to Foster, Bethurum would become so intoxicated during live performances that he "could no longer function." Foster testified that Bethurum's alcohol dependency aside, Bethurum was "a laid-back dude." Barris Ayres, another former band mate, testified that "for the most part, [Bethurum] was really laid back and easy going." Bethurum, however, had a "belligerent" and argumentative side, sometimes arguing about nonsensical or trivial matters.

Lisa Picket and Grant Bethurum, Bethurum's sister and brother, also testified to Bethurum's lack of violent propensities. "I would say that my brother's definitely not violent," testified Grant, adding that Bethurum was a "happy drunk." The State inquired

into whether Bethurum ever struggled to "hold[] down a job" in the "early 2000s" after Bethurum left the "family business, Arlington Arms," a firearms store. Grant testified that he was not sure because he was in the military and "not in the country at that time." Wayman thereafter asked to approach the bench and indicated his intent to elicit evidence of Bethurum's federal conviction for firearms possession, arguing "the State ha[d] opened the door." The State objected, and the trial court overruled Wayman's evidentiary request.

5.     **Wayman**

Wayman testified he had known Bethurum for about twenty-eight years, and Bethurum had never been violent with him. Wayman spoke of one time prior to this incident when Wayman had to ask Bethurum to leave his home, and Bethurum left without issue. Wayman, however, described Bethurum as "rageful" with a "build[-]up of anger." Wayman stated that he also knew of Bethurum's conviction involving "a battery against [Bethurum's] wife."

Wayman testified that sometime after midnight on October 7, 2017, Bethurum "got mad, madder, upsetter [sic], redder" during a discussion of Bethurum's band parting. "At that point[,] I mentioned, you know, maybe he should consider staying on the couch," Wayman said. "[A]fter I brought up the couch, that's when it turned worse." Wayman testified, "[W]here [sic] he refused to leave and refused to get on the couch, I took the gun out and put it to my belly and told him, you know, 'leave or get on the couch,' and that's when he attacked me." Wayman testified that he pulled out the gun "to let [Bethurum] know that [he] wasn't going to allow [Bethurum] to attack [him] without resistance."

Wayman conceded, however, "there was no fight" prior to his retrieval of the gun, and it was only after Wayman pulled out the weapon that Bethurum "charge[d]" him.

11

Wayman then "went from the chair to the wall, then the wall again, then to the floor[,] and around the corner," where Bethurum "pound[ed]" Wayman "in[]to the floor." Wayman, who was on his back on the floor, testified that he propped his "left elbow up" to keep Bethurum off his chest and kept his gun in his right hand against his stomach. Wayman shot Bethurum in the leg while Bethurum was straddled over him. Wayman testified that he "waited seconds later and shot [Bethurum] again in the shoulder" after the first shot "didn't seem to phase" Bethurum. "[Bethurum] had gone pretty much limp at that point, so it didn't take much to make him roll to the right," said Wayman, who then crawled from the hallway to the kitchen, where he called 9-1-1. Wayman estimated less than five minutes had elapsed from the last shot to when he called 9-1-1.

Wayman testified that he found out Bethurum passed away during his interview with police, and although he did not appear to "get emotional" in the recording, he was "heartbroken" and "[m]ortified." Wayman explained that he "can't" cry because he becomes "physically ill" if he does. He further elaborated on his various medical conditions, reiterating much of the same testimony he provided during the hearing on his motion for continuance.[9]

## C.    Jury Charge Conference

During the charge conference, Wayman requested a self-defense instruction, which was granted, and a defense of property instruction, which was denied. *See* TEX. PENAL CODE §§ 9.31, 9.41. With respect to the latter, the State argued that Wayman's requested instruction under § 9.41 was inappropriate given that the force at-issue here,

---

[9] Dykes and Dr. Narayanareddy Balireddy, Wayman's primary care physician, also testified to Wayman's various medical conditions. Dr. Balireddy opined that "when clumped together" with his small stature, Wayman could best be described as a "weak" person.

based on the charging instrument, was deadly force, and § 9.41 only applies to non-deadly force. *See id.* §§ 9.41–.42.

## D.     Verdict and Sentence

The jury returned a guilty verdict, and Wayman was sentenced to twenty years' incarceration. This appeal followed.

## II.     DISCLOSURES AND DUE PROCESS

Per his first and second issues, which we have reorganized below, Wayman asserts claims concerning the same evidence: Peerwani's testimony at trial regarding Bethurum's time of death and the existence of a supplemental report relied on by Peerwani in support of his findings. First Wayman argues "[i]t was an abuse of discretion to allow the State to violate multiple agreed orders related to disclosure of [Peerwani's] expert data twenty days prior to trial." Next Wayman argues that "[t]he State violated [his] rights by failing to turn over *Brady* [e]vidence," namely, the supplemental report. Wayman claims that "[t]he State's deception amounts to a Due Process violation," because the State ultimately "create[d] false impressions of the true evidence to the jury."

## A.     *Brady* Argument

### 1.     Standard of Review and Applicable Law

Under United States Supreme Court precedent beginning with *Brady*, the State is required to disclose evidence known to it that is favorable or material to a defendant's guilt or punishment regardless of whether the defendant requests it. *See Brady*, 373 U.S. at 87; *Fears v. State*, 479 S.W.3d 315, 327 (Tex. App.—Corpus Christi–Edinburg 2015, pet. ref'd). Generally, for a defendant to succeed on a *Brady* claim against the State, he must prove three requirements: "(1) the State suppressed evidence; (2) the suppressed

evidence is favorable to the defendant; and (3) the suppressed evidence is material." *Ex parte Lalonde*, 570 S.W.3d 716, 724 (Tex. Crim. App. 2019) (citing *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006)); *see also Brady*, 373 U.S. at 87.

Favorable and material evidence known must be disclosed "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. However, "*Brady* and its progeny do not require prosecuting authorities to disclose exculpatory information to defendants that the State does not have in its possession and that is not known to exist." *Pena v. State*, 353 S.W.3d 797, 810 (Tex. Crim. App. 2011). To the second prong, favorable evidence is that which, if disclosed and used effectively, "may make a difference between conviction and acquittal." *Lalonde*, 570 S.W.3d at 724 (quoting *Harm*, 183 S.W.3d at 408). Favorable evidence includes exculpatory evidence as well as impeachment evidence. *Id.* "Incorporated into the third prong, materiality, is a requirement that [the] defendant must be prejudiced by the [S]tate's failure to disclose the favorable evidence." *Id.* (quoting *Harm*, 183 S.W.3d at 406). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *Ex parte Adams*, 768 S.W.2d 281, 291 (Tex. Crim. App. 1989) (adopting *Bagley* standard of materiality); *see Lalonde*, 570 S.W.3d at 725.

### 2.    Analysis

Wayman argued that the State failed to provide him with the complete medical examiner's investigator's report, written by Jamie Smith,[10] which "Peerwani relied upon

---

[10] Smith, an investigator employed by the medical examiner's office, did not testify at trial.

in making his opinions" in his report and at trial. Wayman additionally asserts that the investigator's full report contained the following favorable and material evidence:

> After noting the time of the 9-1-1 call and detailing the facts known at the scene, Smith states in her Full Report that, "The time[]line of events is unclear. It is not known what time this altercation took place or how long it took for the authorities to be notified. . . .["] It shows that Smith, the person whose data was later relied upon [by Peerwani] to try to give expert opinions on [time of death], expressly stated that she couldn't give [time of death] opinions based on what she observed and the information provided by law enforcement. Notably, this statement means she couldn't establish a [time of death] timeline based on lividity *or* rigor mortis. It's no wonder why Peerwani originally stated it would be conjecture to opine on [time of death] in this case.

We find nothing in the record that shows the State was aware that the complained of evidence existed. *See Pena*, 353 S.W.3d at 810; *see also Yow v. State*, No. 13-99-619-CR, 2001 WL 1558582, at *5 (Tex. App.—Corpus Christi–Edinburg Dec. 6, 2001, pet. ref'd) (mem. op., not designated for publication). The State swore on the record that it had been assured that Peerwani's medical examiner's report, which included a toxicology report and two-page report from Smith, was the full report.

Moreover, we are unpersuaded that even if this evidence—a report dictating that the time of death timeline was unclear—had been admitted at trial, the result would have been different. *See Lalonde*, 570 S.W.3d at 725 ("The mere possibility that the undisclosed information might have helped the defense or affected the trial's outcome does not establish materiality."). Peerwani unequivocally stated at trial, as discussed more *infra*, that he lacked necessary information to provide a time of death in this case. Smith's partial report contained no mention of time of death,[11] and Smith's full report is

---

[11] As Wayman himself acknowledges in his brief, Smith's partial report does not provide observations regarding lividity or rigor mortis or a time of death estimation apart from a reiteration of the

15

simply a reiteration of Peerwani's testified-to uncertainty. In other words, Wayman has not demonstrated that the evidence at issue here was material or that he was prejudiced by the allegedly tardy disclosure. *See id.* Therefore, Wayman's *Brady* claim fails. *See Fears*, 479 S.W.3d at 329.

## B. Due Process

Wayman next argues that the State's deception, eliciting false impression testimony from Peerwani regarding time of death amounted to a due process violation.

### 1. Standard of Review and Applicable Law

"The Due Process Clause of the Fourteenth Amendment can be violated when the State uses false testimony to obtain a conviction, regardless of whether it does so knowingly or unknowingly." *Ex parte Robbins*, 360 S.W.3d 446, 459–60 (Tex. Crim. App. 2011). Accordingly, to constitute a due process violation, the testimony used by the State

---

time provided by the paramedics who pronounced Bethurum dead upon their arrival. At trial, the parties disputed what time Smith observed the body, with the State arguing she viewed the body at 8:30 a.m., based on the "ARRIVED" time, as indicated in the exhibit excerpt below:

DATE/TIME M.E. NOTIFIED: 10/7/2017 07:30
ARRIVED: 10/7/2017 08:30
REPORTING PERSON: C. Rodriguez (104)
REPORTING AGENCY: Venus Police Department
ADDRESS: 103 Third St., Venus, Texas 76084
PHONE: (972)366-3332
PRONOUNCED DEAD BY: C. Blume, EMT-P
PRONOUNCING AGENCY: AMR EMS
LAST TREATED BY:

DATE/TIME OF OCCURRENCE: 10/7/2017 06:07
INJURY AT WORK: N0
PLACE OF OCCURRENCE: Private residence, hall, floor
LOCATION: 103 S. Beech, Venus, Texas 76084
TRAUMA RELATED: Yes

WITNESSED BY: Jamie Smith
IDENTIFICATION TYPE: Visual
DATE/TIME OF IDENTIFICATION: 10/7/2017 -Time: 13:20
IDENTIFIED BY:
IDENTIFICATION STATUS: Positive ID
ADDRESS:
PHONE:
COMMENTS:

On the other hand, Wayman argued Smith's partial report indicated she made a visual identification of the body at 1:20 p.m., based on the "DATE/TIME OF IDENTIFICATION" time marked above. Smith's full report does not provide further clarity on this matter.

must have been false, and it must have been material to the defendant's conviction—meaning "there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 103–04 (1976)). Neither the witness's intent nor the State's intent in introducing false impression testimony is relevant to a false testimony due process error analysis. *Ukwuachu v. State*, 613 S.W.3d 149, 156 (Tex. Crim. App. 2020); *Ex parte Weinstein*, 421 S.W.3d 656, 666 (Tex. Crim. App. 2014). "[A] witness's good or bad faith is irrelevant to establishing falsity . . . because a false-evidence due-process claim is 'not aimed at preventing the crime of perjury—which is punishable in its own right—but [it is] designed to ensure that the defendant is convicted and sentenced on truthful testimony.'" *Ukwuachu*, 613 S.W.3d at 156 (quoting *Ex parte Ghahremani*, 332 S.W.3d 470, 477–78 (Tex. Crim. App. 2011)). "Though the case law in this area frequently refers to 'perjured' testimony, there is no requirement that the offending testimony be criminally perjurious." *Ghahremani*, 332 S.W.3d at 477. Testimony may be "false" simply "because it creates a false impression of the facts." *Robbins*, 360 S.W.3d at 462; *Ghahremani*, 332 S.W.3d at 477.

The law governing the falsity prong of a false-evidence claim requires both (1) an allegation of falsity of some particular testimony and (2) proof of that falsity with highly persuasive evidence that undermines the evidence presented at trial. *See Ukwuachu*, 613 S.W.3d at 157. We first determine whether the testimony at issue was false or if "taken as a whole, gives the jury a false impression." *Ex parte Weinstein*, 421 S.W.3d at 666 (internal quotations omitted).

## 2.      Analysis

Wayman argued that the State elicited testimony from Peerwani which created a false impression:

> The prosecutor promised the jury [during voir dire] that Peerwani would testify that Bethurum died at least 4-6 hours before [Wayman] called 9-1-1. All was well with their theory on direct, when Peerwani testified that lividity is fixed 6-10 hours after death, and Bethurum's lividity was fixed at 8:30 a.m. But once Defense made it clear that Smith didn't observe fixed lividity until at least 1:20 p.m., [Wayman's] timeline made perfect sense and the State's fell apart. Instead of conceding, the State tried to manipulate the science of lividity on redirect to fulfill their promise. Through leading questioning on re-direct, Peerwani changed his testimony of the fixed-lividity timeline to a minimum of eight hours after death, instead of a six. The prosecutor used this new range to demonstrate through Peerwani that Bethurum would have died at 5:21 a.m. even using the lowest end of the new timeline. Defense brought up Peerwani's original timeline of 6-10 hours on re-cross, illustrating the false information elicited by the State's questioning. However, the State forcefully adopted the 8-12 hour timeline again in closing argument, ignoring the two-hour window that aligned with [Wayman's] testimony.[12]

We disagree that Peerwani's testimony resulted in a false impression of the facts when Peerwani repeatedly cautioned the State and Wayman that he was unable to provide a definitive time of death:

> [State:]      And does lividity, does it become fixed at a certain point?
>
> [Peerwani:]   Yes, lividity does get fixed. The blood begins to gravitate. It's perceptible in a light-skin person as early as 30 minutes after death. But this early stage, when you compress it, it blanches, but depending upon what literature you read and how much blood he has lost, it could take six, eight, 10 hours to get fixed. And when you say "fixed", what you mean by that is that when you compress that blood which has pooled in the dependent portion, it normal blanches. And we use the word, it is now a "fixed lividity.["] It is totally independent of the temperature.

---

[12] To the extent that Wayman seeks to assert on appeal that the State's closing argument was improper or prejudiced him, Wayman has failed to preserve his complaint for review because Wayman did not object to the State's closing argument. *See Hernandez v. State*, 538 S.W.3d 619, 622 (Tex. Crim. App. 2018) ("The right to a trial untainted by improper jury argument is forfeitable."). An alleged erroneous jury argument must be preserved by objection or any error is waived. *Id.* at 623–24; *see* TEX. R. APP. P. 33.1.

. . . .

[State:] What, based off of your—Can you render an opinion as to a time frame, a range in time in which he would have passed away, the lividity would have become fixed?

[Peerwani:] Again, it is not precise at all, but can only talk in generalities and give a timeline or a window. As I mentioned earlier on, lividity takes six to eight hours, or eight to 10, depending upon which literature you read. So at certainly one-and-a-half or two hours is too early for it to be fixed. At this stage, it is not fixed.

. . . .

[Wayman's questioning on cross-examination:]

[Wayman:] What you've told me is that your testimony with regard to the time of death is essentially four to six hours before fixed lividity was observed by your investigator; is that right?

[Peerwani:] I didn't use those words. I said there is a window. And if the observation made by my investigator is correct, that it is inconsistent that he died at 6:00 in the morning.

. . . .

[State's questioning on re-direct examination:]

[State:] Dr. Peerwani, you testified previously that in order for lividity— lividity sets in in [sic] eight to 12 hours, correct?

[Peerwani:] It begins shortly after death, it's perceptible in half-an-hour to two hours, and it gets fixed at about eight to 12 hours.

Generally, the Texas Court of Criminal Appeals has held that testimony is false because it creates a false impression, or the witness omitted or glossed over pertinent facts. *See, e.g.*, *Lalonde*, 570 S.W.3d at 723 (concluding the State's witness provided false testimony when he "testified that he had served as an instructor for . . . EPIC . . . , but EPIC officials were unable to find any documentation or evidence indicating that [the witness] had ever been an EPIC instructor"); *Ghahremani*, 332 S.W.3d at 479 (concluding

19

that a witness's testimony created a misleading impression of the facts because of the gravity of the events omitted where the witness, the complainant's mother, denied that anything else was different about the complainant prior to the assault, and the record showed that the complainant sold drugs and was initiated into a gang during that period); *see also Strickland v. State*, No. 13-16-00701-CR, 2020 WL 373072, at *18–19 (Tex. App.—Corpus Christi–Edinburg Jan. 23, 2020, no pet.) (mem. op., not designated for publication) (concluding that a witness did not provide false testimony where a witness told defense counsel during voir dire that he "would not testify to a 'certainty' that a certain firearm was used" but would "state in 'his expert opinion' if he believed" the bullets came from a certain gun and later testified that "based on his 'experience and training,' his expert opinion was that Strickland's Glock .45 fired the four casings").

Here, Peerwani was candid about his professional opinion regarding lividity, rigor mortis, and time of death, conceding repeatedly that any specific time of death purported by either party could not be substantiated due to a myriad of unknown factors. Wayman positively commented on Peerwani's "integrity" in his closing arguments, acknowledging that Peerwani was clear in his inability to provide a specific time of death. That the State used Peerwani's broad estimates in its favor during its opening statements and closing arguments is not enough to sustain a false evidence claim, and any conflicts in Peerwani's testimony were for the jury to resolve. *See Ukwuachu*, 613 S.W.3d at 157 ("[A] prosecutor's questions of a witness and his arguments to the jury are not 'evidence' within the meaning of a false-evidence claim."); *see, e.g.*, *Vollick v. State*, No. 13-14-00261-CR, 2015 WL 4504913, at *6 (Tex. App.—Corpus Christi–Edinburg July 23, 2015, pet. ref'd) (mem. op., not designated for publication) (concluding that a witness had not provided

false or misleading testimony where he testified that his driver's license contained no restrictions "in light of medical records that showed he was diagnosed with glaucoma" because, at most, "this was a conflict in the evidence which the jury, as finder of fact, was entitled to resolve"). Therefore, Wayman is unable to satisfy the falsity prong of a false-evidence claim. We overrule Wayman's second issue.

## C.     Pre-Trial Motions

We now turn to Wayman's first issue, wherein Wayman argues that "[i]t was an abuse of discretion to allow the State to violate multiple agreed orders[13] related to disclosure of expert data twenty days prior to trial."

### 1.     Preservation

It is axiomatic that the trial court's ruling on a motion in limine generally preserves nothing for review. *See Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) ("A motion *in limine* . . . is a preliminary matter and normally preserves nothing for appellate review. For error to be preserved with regard to the subject of a motion *in limine*, an objection must be made at the time the subject is raised during trial."). This is true regardless of whether the motion is granted or denied. *Id.*; *Harnett v. State*, 38 S.W.3d 650, 655 (Tex. App.—Austin 2000, pet. ref'd); *see also Sanders v. State*, No. 02-18-00539-CR, 2020 WL 5242436, at *10 (Tex. App.—Fort Worth Sept. 3, 2020, pet. ref'd) (mem. op., not designated for publication). Where an appellant objects to a violation of a pre-trial order, but not to admission of evidence itself, no error is preserved. *Thierry v. State*, 288 S.W.3d 80, 87 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (citing *Harnett*

---

[13] Wayman references two pre-trial motions on appeal, his motion in limine and "Motion for Disclosure of Rule 702 Witnesses and Any Facts or Data Relied Upon By Said Witnesses."

*v. State*, 38 S.W.3d 650, 655 (Tex. App.—Austin 2000, pet. ref'd)); *see also Jimenez v. State*, No. 04-15-00199-CR, 2016 WL 929211, at *2 (Tex. App.—San Antonio Feb. 24, 2016, no pet.) (mem. op., not designated for publication). This is because a ruling on a motion in limine is not a ruling on the merits; rather, it is a ruling that regulates the administration of trial, and a trial court's decision on matters presented in a motion in limine is subject to reconsideration throughout the course of trial. *See Thierry*, 288 S.W.3d at 87; *Lusk v. State*, 82 S.W.3d 57, 60 (Tex. App.—Amarillo 2002, pet. ref'd) ("Even if there has been a violation of the order on the motion *in limine,* a party must object to the admission or exclusion of evidence or other action in order to preserve error for appeal as to the evidentiary ruling.").

### 2. Analysis

At trial, Wayman argued that the State violated his motion in limine, which required the disclosure of evidence under Rules 702, 703, and 705 before the twentieth day of trial—language near verbatim to Texas Code of Criminal Procedure article 39.14(b), a provision often cited in pursuance of a discovery disclosure challenge. *See* Tex. Code Crim. Proc. Ann. art. 39.14(b); Tex. R. Evid. 702, 703, 705. Yet, discussions or applications of article 39.14 or Rules 702, 703, or 705 are notably absent from issue one of his brief, which spans sixteen pages. Wayman makes only one reference to article 39.14; under the "Relevant Facts" section of issue one, Wayman states: "Defense also sent the State a letter requesting all discoverable evidence under Article 39.14 on June 25, 2018." Similarly, Rule 702 is only mentioned in context of the title to his motion. Rules 703 and 705 are not cited.

Given Wayman's chosen title for his issue and having analyzed the argument presented, we construe Wayman's argument on appeal as one which exclusively contests the State's purported violation of the trial court's orders granting Wayman's motion in limine and disclosure motion—not a challenge of the issues potentially contained within the respective motions, i.e., Peerwani's expert qualification under Rule 702[14] or a challenge of untimely disclosure under Article 39.14. *See* TEX. CODE CRIM. PROC. ANN. art. 39.14(b); TEX. R. EVID. 702. Such conclusion is further supported by the limited authority which Wayman cites: *Martinez v. State*, 867 S.W.2d 30, 39 (Tex. Crim. App. 1993) for the proposition that there should be consequences "[w]hen a judge allows testimony that doesn't comply with evidentiary court orders," and *Smith v. State*, No. 09-97-175CR, 1999 WL 64262, at *1 (Tex. App.—Beaumont February 10, 1999, no pet.) (mem. op., not designated for publication) for the proposition that "filing a Motion in Limine is to limit opening statements, and appellate courts have agreed that Motions in Limine apply to opening statements."

Wayman's argument on appeal concerns the State's claimed violation of the trial court's pretrial orders—not the admission of evidence itself. Therefore, he presents nothing for our review. *See Thierry*, 288 S.W.3d at 87; *Harnett*, 38 S.W.3d at 655. We overrule Wayman's first issue.

---

[14] Rule 702 concerns expert witness qualifications. *See* TEX. R. EVID. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."). Wayman did not contest the trial court's designation of Peerwani as an expert witness or Peerwani's qualifications as an expert at trial. Moreover, Wayman made no such request for a hearing under Rule 702 at trial. To the extent he means to assert now that the trial court abused its discretion in failing to grant such hearing, we conclude that issue has been waived. *See* TEX. R. APP. P. 33.1.

23

## III.     EXPERT AND LAY WITNESS TESTIMONY

Wayman next argues the trial court abused its discretion in allowing Rodriguez, Bartlett, and Blume to testify regarding observed lividity.[15]

**A.     Standard of Review and Applicable Law**

As with the admissibility of evidence generally, the qualifications of a witness to testify as an expert or as a lay witness are within the discretion of the trial court. *See* TEX. R. EVID. 104(a); *Osbourn v. State*, 92 S.W.3d 531, 537–38 (Tex. Crim. App. 2002). Absent a showing of an abuse of discretion, such decision will not be disturbed on appeal. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019) (citing *Osbourn*, 92 S.W.3d at 537).

Rules 701 and 702 concern lay witness and expert witness opinion testimony, respectively. TEX. R. EVID. 701, 702. Rule 701 requires that (1) a witness rationally base his or her opinion on his or her "objective perception of events—i.e., his own senses or experience" and that (2) the opinion be helpful to clearly understand the witness's testimony or to determine a fact in issue. *Hartwell v. State*, 476 S.W.3d 523, 536 (Tex. App.—Corpus Christi–Edinburg 2015, pet. ref'd) (citing *Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997)). An opinion is rationally based on a witness's perception if a reasonable person could draw the same opinion under the circumstances. *Id*. So long as the witness's opinions, beliefs, or inferences are drawn from his or her own experiences

---

[15] Wayman cites to no caselaw in support of this issue. *See* TEX. R. APP. P. 38.1(i) (requiring that an appellant's brief must contain "appropriate citations to authorities and to the record"). However, unlike issue one, Wayman's issue three argument is otherwise clear and reviewable on appeal; thus, we address this issue in the interest of justice. *See Thomas v. State*, 615 S.W.3d 552, 566 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (providing that where an appellate court may "determine with reasonable certainty the errors about which [an appellant] complains," it may review arguments "in the interest of justice").

or observations, the witness may testify concerning those opinions, beliefs, or inferences. *Osbourn*, 92 S.W.3d at 535; *Hartwell*, 476 S.W.3d at 536.

Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. However, the State is required to disclose the name and address of each person to present evidence under Rule 702 following a party's request that it do so.[16] *See* TEX. CODE CRIM. PROC. ANN. art. 39.14.

"There is no distinct line between lay opinion and expert opinion." *Rhomer*, 569 S.W.3d at 669 (citing *Osbourn*, 92 S.W.3d at 537). "A person with specialized knowledge may testify about his or her own observations under Rule 701 and may also testify about the theories, facts[,] and data used in his or her area of expertise under Rule 702." *Osbourn*, 92 S.W.3d at 536. Put simply, a witness's qualifications as an expert do not exclude him or her from testifying as a lay witness under Rule 701 provided the elements of Rule 701 are independently met. *Id.*; *see also Flood v. State*, No. 13-10-00266-CR, 2011 WL 2732608, at *2 (Tex. App.—Corpus Christi–Edinburg July 14, 2011, pet. ref'd) (mem. op., not designated for publication) (concluding that *Osbourn* suggests that "experts are not precluded from offering lay testimony regarding events which they have personally observed").

---

[16] Wayman made such a request in this case. *See* TEX. CODE CRIM. PROC. ANN. art. 39.14. Rodriguez, Bartlett, and Blume are not listed in the State's "Designation of Expert Witness[es]" notice filed prior to trial. Their names only appear in the State's filed "Witness List."

## B.    Analysis

Wayman objected when Rodriguez testified that "discoloration, paleness, purpleness color of the skin due to lack of blood flow" may be indicators of lividity, which can take "effect" as early as "20, 30 minutes," but often will not "set in heavier" until "six to eight hours or longer." Wayman did not object to Rodriguez's testimony that he had "noticed [indicators] on [Bethurum's] hand, on his face, some on his arms." Meanwhile, Bartlett testified, following an objection by Wayman, that it "appeared that there had been some time" between when he viewed the body and when Bethurum passed, because he observed Bethurum's body was "extremely pale" with "purple spottings along his arm."

Before testifying about lividity, Rodriguez testified he had worked for nine years as a crime scene investigator, during which he had amassed extensive training and experience. Bartlett testified that throughout his nineteen years of experience in law enforcement, he had "encountered a deceased person" on "several occasions" and agreed he had seen people "in different states of just passing."

Where, as here, an officer articulates that testimony elicited regarding lividity is based on firsthand observations and perceptions—even if those observations and perceptions are rooted in an officer-based experience—such testimony is permissible under 701. *See Osbourn*, 92 S.W.3d at 536–37; *see, e.g.*, *Amunson v. State*, 928 S.W.2d 601, 606 (Tex. App.—San Antonio 1996, pet. ref'd) (concluding that the officer's testimony "over defense counsel's objection, that rigor mortis had set in" was "based on first[-]hand knowledge" and therefore admissible under 701); *see also Thompson v. State*, No. 14-09-00845-CR, 2011 WL 782051, at *7 (Tex. App.—Houston [14th Dist.] Mar. 8, 2011, pet. ref'd) (mem. op., not designated for publication) (concluding the same where the officer

26

testified that he "had 'easily' seen hundreds of homicide victims" and "had amassed extensive training and experience" as a crime-scene investigator before testifying to lividity and rigor mortis under 701 and 702). Moreover, although Wayman does not dispute whether subpart (b) of Rule 701 was satisfied, the officers' testimony was helpful in determining a fact at issue—whether lividity had or had not set in at the time of the officers' arrival on-scene. *See* TEX. R. EVID. 701(b); *Hartwell*, 476 S.W.3d at 536. On the record before us, we cannot say that the trial court abused its discretion in admitting Rodriguez and Bartlett's testimony under Rule 701.

With respect to Blume, the emergency technician, Wayman objected[17] to Blume's testimony that rigor mortis occurs "[o]ver the course of time," stated in response to the State's question: "Now, with rigor mortis, to your understanding, is it something that happens—does it happen over the course of time or is it something that immediately occurs and all [of] the sudden someone is [sic]?" Assuming arguendo that Blume's testimony that rigor mortis occurs "[o]ver the course of time" was inadmissible, any error in admitting it was rendered harmless because substantially the same evidence was admitted through Peerwani without objection. *See Petriciolet v. State*, 442 S.W.3d 643, 654 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) ("Error in the admission of evidence may be rendered harmless when substantially the same evidence is admitted elsewhere without objection." (citing *Anderson v. State,* 717 S.W.2d 622, 628 (Tex. Crim. App. 1986))); *Lopez v. State*, 288 S.W.3d 148, 156 (Tex. App.—Corpus Christi–Edinburg 2009, pet. ref'd) (concluding error arising out of a witness's complained-of testimony was

---

[17] Wayman, however, did not object to: Blume's explanation that rigor mortis is the stiffening of joints and muscles; Blume's confirmation that he had observed "stiffness" in Bethurum's body; and Blume's testimony that "lividity was setting in" based on the "purple-grayish color of [Bethurum's] skin."

27

harmless where the same evidence was subsequently admitted without objection); *see also* TEX. R. APP. P. 44.2(b) (providing that nonconstitutional error "that does not affect substantial rights must be disregarded").

We are convinced that Blume's vague testimony that rigor mortis generally occurs over an unspecified amount of time did not have a substantial and injurious effect or influence on the jury's verdict. *See Thomas v. State*, 505 S.W.3d 916, 927 (Tex. Crim. App. 2016) ("If, after a review of the record as a whole, the appellate court can say that it 'has fair assurance that the error did not influence the jury, or had but a slight effect,' then the error is harmless." (quoting *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002))).

We overrule Wayman's third issue.

### IV. EXCLUSION OF EVIDENCE

By his fourth issue, Wayman asserts that the trial court abused its discretion in "prohibit[ing] the defense from presenting evidence that Bethurum had gone to federal prison for a domestic violence related offense."[18]

### A. Standard of Review and Applicable Law

We review a trial court's decision to exclude evidence of a decedent's character for an abuse of discretion. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018).

---

[18] Bethurum was convicted of misdemeanor attempted assault causing bodily injury in 1997 for assaulting his then-spouse. Bethurum was later convicted of possessing a firearm in violation of a federal statute making it "unlawful for any person who has been convicted in any court of a misdemeanor crime of domestic violence to . . . possess in or affecting commerce, any firearm or ammunition" because Bethurum sold firearms at Arlington Arms, his family's store, following his 1997 assault conviction. *See* 18 U.S.C. § 922(g)(9); *see also United States v. Bethurum*, 343 F.3d 712, 713 (5th Cir. 2003) (detailing Bethurum's state misdemeanor conviction as it relates to his federal conviction).

28

A trial court abuses its discretion only if the court's ruling is so clearly wrong as to lie outside the zone within which reasonable people might disagree. *Id.*

While evidence of a person's character is generally not admissible to prove that on a particular occasion the person acted in accordance with that character, TEX. R. EVID. 404(a)(1), a defendant in a homicide prosecution who raises the issue of self-defense may introduce evidence of the decedent's violent character. *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). Specific violent acts of misconduct by the decedent may be admitted to show (1) the reasonableness of the defendant's apprehension of danger, or (2) that the deceased was the first aggressor. *Id.*; *see also Rodriguez v. State*, No. 13-16-00396-CR, 2018 WL 2252882, at *8 (Tex. App.—Corpus Christi–Edinburg May 17, 2018, no pet.) (mem. op., not designated for publication) (explaining the purpose of invoking Rule 404 in the context of presenting evidence in support of a defendant's self-defense claim).

Such character evidence may be also admissible where a witness in a homicide case "opens the door" to rebuttal character evidence by placing the decedent's peaceable character at issue. *Allen v. State*, 473 S.W.3d 426, 454 (Tex. App.—Houston [14th Dist.] 2015, pet. dism'd); *see Daggett v. State*, 187 S.W.3d 444, 453 n.24 (Tex. Crim. App. 2005) ("When a witness makes a broad statement of good conduct or character on a collateral issue, the opposing party may cross-examine the witness with specific instances rebutting that false impression, but generally may not offer extrinsic evidence to prove the impeachment acts."). Under Rule 405, proof of character must be made by testimony as to reputation or by testimony in the form of an opinion. *See* TEX. R. EVID. 405. Even if a party opens the door to rebuttal evidence, the trial court still has discretion

29

to exclude the evidence under Rule 403. *Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009); *see* TEX. R. EVID. 403. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403; *see also* TEX. R. EVID. 401 (providing that evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence).

The burden is on the proponent of evidence to tell the trial court why the evidence is admissible following an objection by the opponent of the evidence. *White v. State*, 549 S.W.3d 146, 152 (Tex. Crim. App. 2018) (citing *Reyna v. State*, 168 S.W.3d 173, 177 (Tex. Crim. App. 2005)). "[I]t is not enough to tell the judge that the evidence is admissible." *Reyna*, 168 S.W.3d at 177. Further, to preserve a complaint for appellate review, "the record must show that the party stated the grounds for the ruling that [he] sought from the trial court with sufficient specificity to make the trial court aware of the complaint." *Id.* (internal quotations and citations removed); *see* TEX. R. APP. P. 33.1.

## B.    Analysis

The specific argument Wayman presents on appeal diverges from his arguments made before the trial court. Wayman now argues that (1) the State "opened the door" when it elicited testimony regarding Bethurum's propensity, or lack thereof, for violence, and (2) the admission of evidence concerning Bethurum's domestic violence conviction was necessary to support his self-defense claim. *See* TEX. R. EVID. 403, 404, 405; *Torres*, 71 S.W.3d at 760. Wayman's arguments at trial, however, lacked such specificity. After

30

Grant testified that Bethurum worked at Arlington Arms and struggled to find employment for a period of time, Wayman asked to approach the bench. The following ensued:

[Wayman:] I would like to inquire about the terms of the [State's] Motion in Limine,[19] and may be better outside the presence of the Jury, however the Court wants to handle it.

THE COURT: What's the subject?

[Wayman:] I believe that potentially the State has opened the door through this witness to us [sic] getting in[]to a conviction for selling firearms.

THE COURT: Oh.

(In open court.)

THE COURT: Let me excuse the Jury for a few minutes.

(Jury not present)

THE COURT: All right. You may be seated. State your request.

[Wayman:] Your Honor, I believe that there's evidence that Brett Bethurum sold firearms as was just testified to by his brother, and that because of a state conviction for domestic violence, he was then sent to federal prison for selling those firearms. The State has just asked about the job situation of Mr. Bethurum. He's mentioned repeatedly that he worked for the family business, how he had—if he had trouble continuing to get jobs. So we believe at this point the State has opened the door in to us inquiring about the idea that he sold firearms and went to federal prison for that. And so we would ask to be able to get in to that subject.

---

[19] In relevant part, the State's motion in limine requests:

That the Court instruct counsel for the defense and all defense witnesses not to inform the jury without leave of the court that the victim in this case, Brett Bethurum, was arrested for, convicted of, or acquitted of, the offense of "possessing a firearm after conviction for misdemeanor domestic violence" as discussed in *United States v. Bethurum*, 343 F.3d 712 (5th Cir. 2003) or that the aforementioned case and facts and circumstances discussed therein, exist until the admissibility of the same under Rules 401, 402, 403, and 404 of the Texas Rules of Evidence, is first determined outside the presence of the jury.

31

| [State:] | Your Honor, first of all, it's not a conviction of this witness. It's not an impeachment issue of this witness. Second of all, in order—the State is able to offer evidence of his good character when it is first attacked by the Defense.[20] If they want to bring up a conviction, they can, but it has to have some element of force or aggression associated with it before it can be brought up in this particular instance. So I don't think we've opened the door. I don't think it's relevant to this witness or any of the proceedings of this case. |
|---|---|
| THE COURT: | Okay. Anything else? |
| [Wayman:] | No, Your Honor. |
| THE COURT: | Objection is overruled. Or the request is overruled. The [State's] Motion in Limine stands. |

While the State did not cite to the applicable rules in its challenge of Wayman's attempted admission of evidence of Bethurum's federal conviction, the State argued: (1) Wayman was improperly attempting to impeach the witness, (2) Wayman—not it—had opened the door to evidence of Bethurum's character, and (3) Wayman had not offered the evidence as it related to Wayman's self-defense claim. Wayman provided no response. *See White*, 549 S.W.3d at 152; *Reyna*, 168 S.W.3d at 177. To the extent Wayman attempts to argue on appeal that the evidence of Bethurum's federal conviction was admissible under Rule 404 or to show the reasonableness of Wayman's self-defensive state-of-mind, we conclude such argument has been waived as it does not comport with the complaints made by Wayman at trial. *See* TEX. R. APP. P. 33.1; *Reyna*, 168 S.W.3d at 177; *see also Villegas v. State*, No. 01-17-00109-CR, 2019 WL 2292982,

---

[20] In addition to cross-examining a prior State's witness regarding Bethurum's domestic violence conviction, Wayman's counsel stated during opening statements that "Mr. Wayman knew . . . that Mr. Bethurum had previously been convicted of an attempted assault on his ex-wife Rebecca Bethurum."

at *4 (Tex. App.—Houston [1st Dist.] May 30, 2019, no pet.) (mem. op., not designated for publication) (concluding that where an appellant argued evidence of a witness's conviction was "admissible to correct a false impression created by the State in its direct examination," but he "did not offer either Rule 405(a) or Rule 405(b) as a basis for the admission of the evidence," he "ha[d] waived his complaint about the admissibility of the excluded evidence under those rules").

Likewise, with respect to the admission of Bethurum's federal conviction as rebuttal evidence, the exact purpose Wayman sought to admit Bethurum's federal conviction differs from the purpose he asserts on appeal. Wayman argued at trial that in response to the State's elicitation of testimony that Bethurum "had trouble continuing to get jobs," the State "opened the door in to [sic] [Wayman] inquiring about the idea that [Bethurum] sold firearms and went to federal prison for that." On appeal, Wayman avers that the rebuttal was intended to address the State's elicitation of testimony regarding Bethurum's lack of violent propensity. Because Wayman did not urge that the evidence was admissible under complaints he raises on appeal, his argument is waived. *See* TEX. R. APP. P. 33.1; *Reyna*, 168 S.W.3d at 177; *Allen*, 473 S.W.3d at 455–56. We overrule issue four.

## V. CHARGE ERROR

By his fifth issue, Wayman argues the trial court erred in denying Wayman's request for a defense of property instruction. *See* TEX. PENAL CODE ANN. §§ 9.02, 9.41–.42.

**A.    Standard of Review and Applicable Law**

"[T]rial courts are required to instruct the jury on 'the law applicable to the case.'" *Williams v. State*, No. PD-0477-19, __ S.W.3d __, __ 2021 WL 2132167, at *5 (Tex. Crim. App. May 26, 2021) (quoting *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007)); *see* TEX. CODE CRIM. PROC. ANN. art. 36.14. "Regardless of the strength or credibility of the evidence, a defendant is entitled to an instruction on any defensive issue that is raised by the evidence." *Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020) (citing *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996)). "A defensive issue is raised by the evidence if there is sufficient evidence to support a rational jury finding as to each element of the defense." *Id*. In reviewing whether the trial court erred in refusing to submit a requested defensive instruction, we must examine the evidence offered in support of the defensive issue in the light most favorable to the defense. *Id.* The defendant's testimony alone may be sufficient to warrant a requested defensive instruction. *Beltran v. State*, 472 S.W.3d 283, 290 (Tex. Crim. App. 2015)*.*

If we find the trial court erred in refusing the requested instruction, we then analyze that error for harm. *Gonzalez v. State*, 610 S.W.3d 22, 27 (Tex. Crim. App. 2020). The degree of harm depends on whether the error was preserved. *Jordan*, 593 S.W.3d at 346 (citing *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)); *Hernandez v. State*, 533 S.W.3d 472, 481 (Tex. App.—Corpus Christi–Edinburg 2017, pet. ref'd). Where, as here, the defendant preserved the alleged error, then we must reverse if we find "some harm." *Jordan*, 593 S.W.3d at 346; *Almanza*, 686 S.W.2d at 171.

Defense of property is a justification defense. *See* TEX. PENAL CODE ANN. §§ 9.02, 9.41–.42. An actor is justified in using non-deadly force against another to protect property

when the actor reasonably believes the non-deadly force is immediately necessary to prevent or terminate the other's trespass on the land or unlawful interference with the property. *Id.* § 9.41(a); *see Sparks v. State*, 177 S.W.3d 127, 132 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (observing that § 9.41 only applies to use of "non-deadly force" in defense of property). An actor is justified in using deadly force against another to protect property when (1) he would be justified in using force under § 9.41, (2) he reasonably believes the deadly force is immediately necessary "to prevent the other's imminent commission of arson, burglary, robbery, aggravated robbery, theft during the nighttime, or criminal mischief during the nighttime," and (3) he reasonably believes that the property cannot be protected by other means. *See id.* § 9.42. All three of the statutory circumstances outlined in § 9.42 must exist in order for a defendant to be entitled to an instruction on the use of deadly force in defense of property. *See Jordan*, 593 S.W.3d at 343; *see also Pitts v. State*, No. 14-18-00987-CR, 2020 WL 5522847, at *6 (Tex. App.—Houston [14th Dist.] Sept. 15, 2020, pet. ref'd) (mem. op., not designated for publication).

The mere "threat to cause death or serious bodily injury by the production of a weapon or otherwise, as long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute the use of deadly force." *Id.* § 9.04. However, the same cannot be said where the actor discharges a weapon in a manner "intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury"—which, by definition, constitutes the use of deadly force. *Id.* § 9.01(3) (defining deadly force).

35

**B.     Analysis**

The jury charge included a self-defense instruction, but the trial court declined to include Wayman's requested instruction regarding the use of non-deadly force in defense of property. *See* TEX. PENAL CODE ANN. § 9.41. Wayman did not seek an instruction on the use of deadly force in defense of property. *See id.* §§ 9.41–.42. The State countered that the only potentially applicable instruction here would be the use of deadly force in defense of property because deadly force is the degree of force implicated under the murder statute. *See id.* §§ 9.42, 19.02(b)(1), (2). We agree with the State.

To raise a justification defense, Wayman was required to (1) admit to violating the statute under which he is being tried and (2) then offer a statutory justification for his otherwise criminal conduct. *See Juarez v. State*, 308 S.W.3d 398, 401–02 (Tex. Crim. App. 2010) (citing *Young v. State*, 991 S.W.2d 835, 838 (Tex. Crim. App. 1999)); *see also Newman v. State*, No. 05-13-00404-CR, 2014 WL 3700699, at *4 (Tex. App.—Dallas July 23, 2014, pet. ref'd) (mem. op., not designated for publication). Wayman was charged with murder, and there was no lesser-included offense instruction submitted for the jury's consideration.[21] *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (providing that a person commits the offense of murder by "intentionally or knowingly caus[ing] the death of an individual" or intentionally "caus[ing] serious bodily injury and commit[ting] an act clearly dangerous to human life that causes the death of an individual").

At trial, Wayman admitted to committing murder—namely, intentionally shooting Bethurum with a firearm—and asserted a justification for his actions: self-defense and

---

[21] The State requested several lesser-included offenses, and following Wayman's objections to their inclusion in the charge, the trial court denied the State's request.

defense of property. *See* TEX. PENAL CODE ANN. §§ 9.31 (self-defense), 9.41–.42 (defense of property); *Juarez*, 308 S.W.3d at 401–02. Because Wayman confessed to doing more than "threat[ening] to cause death or serious bodily injury" and "creating an apprehension that he [would] use deadly force," *see id.* § 9.04, and the offense for which Wayman was charged required use of deadly force to be effectuated, *see id.* §§ 9.01(3), 19.02(b)(1), (2), the trial court properly refused to submit a jury instruction on Wayman's requested non-deadly force justification defense. *See, e.g.*, *Young*, 991 S.W.2d at 838; *see also Newman*, 2014 WL 3700699, at *4. We overrule Wayman's fifth issue.

## VI. MOTION FOR CONTINUANCE

By his sixth issue, Wayman argues that the trial court abused its discretion when it denied his motion for a continuance, which had been requested on the basis that Wayman needed more time "to be well enough for his trial."

### A. Standard of Review and Applicable Law

We review a trial court's ruling on a motion for continuance for an abuse of discretion. *Fears*, 479 S.W.3d at 325 (citing *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007)). A motion for a continuance must be in writing, set forth in full the sufficient cause for delay, and be sworn by someone having personal knowledge of the facts relied on for the request. TEX. CODE CRIM. PROC. ANN. arts. 29.03, 29.08. When the basis for a motion for continuance is related to a defendant's health, appellate review is based solely on "the cold record" because the trial court was in the best position to judge appellant's physical and mental condition, his ability to stand trial, and his ability to assist in his own defense. *Compton v. State*, 500 S.W.2d 131, 133 (Tex. Crim. App. 1973); *see Dix v. State*, 155 S.W.2d 923, 924–25 (Tex. Crim. App. 1941) ("An application for

37

continuance based on the illness of a defendant is addressed to the sound discretion of the trial judge and before this court would be justified in saying that he had abused that discretion it should clearly appear from the record that he had done so."); *see also Huddleston v. State*, No. 01-00-01174-CR, 2001 WL 1243962, at *1–2 (Tex. App.—Houston [1st Dist.] Oct. 18, 2001, pet. ref'd) (mem. op., not designated for publication) (deferring to the trial court's judgment and concluding that the trial court did not abuse its discretion when it denied appellant's motion for continuance based on appellant's medical condition). To establish an abuse of discretion, a defendant must show the denial of his motion actually prejudiced him. *Gallo*, 239 S.W.3d at 764; *see also Casillas v. State*, No. 04-19-00314-CR, 2020 WL 2441432, at *2 (Tex. App.—San Antonio May 13, 2020, no pet.) (mem. op., not designated for publication).

## B. Analysis

In October 2019, Wayman testified he suffered from several debilitating ailments, and one year prior, he had been given an estimated life expectancy of one to three years. Wayman was principally concerned that his condition would affect his ability to concentrate and actively participate in his trial because he "would be in too much pain, wouldn't be able to breath[e], and wouldn't be able to sit up throughout the trial." Wayman, however, also acquiesced that if given accommodations, including the ability to have an oxygen tank at his side and multiple recesses so that he may self-administer his medication, he could sit through trial. Wayman's only witness, his former nurse, testified that with proper accommodations, Wayman's ailments could be managed throughout trial. *See Norwood v. State*, 486 S.W.2d 776, 780–81 (Tex. Crim. App. 1972) (holding trial

court did not err in denying motion for continuance where doctor testified appellant's medical complaints could be managed on outpatient basis).

Wayman asserts on appeal that he was harmed at trial for the same reasons he cautioned he would be during the hearing on his motion: he could only sit up for two hours at a time at trial, and he was in a significant amount of pain "which limited his ability to concentrate and help the Defense." However, it appears from the record that Wayman had no trouble understanding or answering his counsel, the State, or the judge during the hearing on his motion for continuance or at trial. Additionally, the trial court took several recesses to accommodate Wayman throughout the trial. At no time during the trial did Wayman again request a continuance or otherwise indicate that his condition was interfering with his ability to assist counsel. *See Compton*, 500 S.W.2d at 132–33 (concluding that it did not appear from the testimony that appellant was unable to assist counsel in trial preparation despite a medical condition and therefore, there was no abuse of discretion in denying appellant's motion for continuance); *Cruz v. State*, 565 S.W.3d 379, 382 (Tex. App.—San Antonio 2018, no pet.) (considering the appellant's ability to assist in his defense at trial, as evidenced by the record, before concluding that the trial court did not abuse its discretion in denying appellant's request for continuance based on an existing medical condition); *see also Alvarez v. State*, No. 13-14-00177-CR, 2014 WL 4402381, at *1–2 (Tex. App.—Corpus Christi–Edinburg Aug. 29, 2014, no pet.) (mem. op., not designated for publication) (concluding the same where appellant argued that "the trial court should have granted a continuance or a recess to allow Alvarez to regain his health so that he could participate at trial" because "[n]othing in the record indicates

39

that Alvarez was unable to effectively communicate with his trial attorney or even that he or his attorney believed he was incapable of doing so").

Although Wayman argues he was specifically prejudiced by the trial court's denial of his motion because his condition precluded him from being able to "physically show how he was attacked," there is no evidence in the record to indicate that Wayman's condition would have improved—and thereby Wayman would have been physically capable of demonstrating anything—had the trial been continued. *See Hernandez v. State*, 585 S.W.3d 537, 560–61 (Tex. App.—San Antonio 2019, pet. ref'd) (concluding there was no abuse of discretion where the appellant "has not shown that he was actually prejudiced by the denial of his motion for continuance").

Based on our review of the record, we conclude that Wayman has not shown that he was actually prejudiced by the denial of his motion, and the trial court did not abuse its discretion in denying Wayman's motion for continuance. *See Gallo*, 239 S.W.3d at 764. We overrule Wayman's sixth issue.

## VII.  CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
12th day of August, 2021.